# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **ZENITH INSURANCE COMPANY**, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>**TEXAS INSTITUTE FOR SURGERY, LLP**, a Texas limited liability partnership doing business as "Texas Institute for Surgery at Texas Health Presbyterian Dallas"; and<br>**JOHN VINCENT ZIPPER**, a Texas citizen,<br><br>Defendants. | Case No. 3:18-cv-00182-D<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

## I.

## JURISDICTION

1. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). The plaintiff and the defendants are citizens of different states (as more specifically alleged in paragraphs 6-7 below), and the amount in controversy in this matter exceeds $75,000.00 exclusive of interest and costs.

## II.

## VENUE

2. Venue is proper in the United States District Court, Northern District of Texas, under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this claim occurred in this district, at or near Dallas, Texas; and because one or more of the defendants is subject to personal jurisdiction in this district.

## III.

## SHORT SUMMARY OF THE CASE

3. On April 30, 2016, Tyra Price ("Tyra") suffered an industrial injury to her right ankle when she slipped and fell at work. At the time of the injury, Tyra was employed in Dallas by Star Dunkin, L.P. On May 20, 2016, Tyra underwent what should have been routine ankle surgery at Texas Institute for Surgery. During that surgery, the hospital and its physicians, nurses and others negligently and carelessly failed to protect Tyra's airway while she was under general anesthesia. This negligent and careless conduct prevented Tyra from breathing, and caused her to suffer cardiac arrest. Tyra was not resuscitated for more than 20 minutes, leading to permanent anoxic brain injuries. At

the time of this incident, plaintiff Zenith Insurance Company was the workers compensation insurer for Tyra's employer. Plaintiff has paid, and will continue to pay, millions of dollars in medical and indemnity obligations resulting from defendants' misconduct. Plaintiff brings this action to assert its subrogation rights against those who were responsible for causing Tyra's life-altering brain injuries, and to recover all damages plaintiff has suffered as a result of the negligent misconduct of the defendants.

## IV.

## PRE-SUIT STATUTORY COMPLIANCE

4. Plaintiff has fully complied with all of the applicable pre-suit notice requirements of Texas Civil Practice and Remedies Code, Chapter 74.

## V.

## PARTIES

5. Plaintiff Zenith Insurance Company ("Zenith") was incorporated in the State of California in 1949. Zenith maintains and operates its principal place of business in Woodland Hills, California, which is also Zenith's "nerve center" and the place where Zenith's officers direct, control, and coordinate Zenith's activities. At all relevant times, Zenith was the workers compensation insurer for Star Dunkin L.P. ("Star Dunkin"), a limited partnership organized under the laws of the State of Delaware. Star Dunkin maintains and operates its principal place of business in Canton, Massachusetts, which is also Star Dunkin's "nerve center" and the place where Star Dunkin's general partners direct, control, and coordinate Star Dunkin's activities. Star Dunkin's partners are individuals and business entities who are citizens of Massachusetts and/or states other

than Texas. Zenith paid and is paying the entire loss on behalf of Star Dunkin, meaning that Zenith is paying all compensable workers compensation benefits owed by Star Dunkin as a result of Tyra's industrial injury and the ensuing anoxic brain injuries she suffered while receiving medical treatment for her industrial injuries.

6. Defendant Texas Institute for Surgery, LLP ("TIFS") is a limited liability partnership organized in Texas in 2000. At all relevant times, TIFS conducted business under the assumed name of "Texas Institute for Surgery at Texas Health Presbyterian Dallas." TIFS maintains and operates its principal place of business in Dallas, Texas, which is also TIFS' "nerve center" and the place where TIFS' partners direct, control, and coordinate TIFS' activities. TIFS' partners are: (A) a Texas nonprofit corporation; (B) dozens of individual physicians who are citizens of Texas; and (C) a Texas limited liability company whose members are citizens of Texas and Tennessee. More specifically, TIFS' partners are:

A. Texas Health Presbyterian Hospital Dallas, a nonprofit corporation organized in Texas in 1958, with its principal place of business in Texas, where its officers direct, control and coordinate the corporation's activities from its headquarters and "nerve center" in Dallas, Texas; and

B. The following individuals: Ford Albritton IV, M.D., a citizen of Texas; Gregg Anigian, M.D., a citizen of Texas; Evan Bates, M.D., a citizen of Texas; James Bates, M.D., a citizen of Texas; Bruce Beavers, M.D., a citizen of Texas; Elie Benaim, M.D., a citizen of Texas; Michael Bogdan, M.D., a citizen of Texas; Wesley Anne Brady, M.D., a citizen of Texas; Leon Brill, M.D., a citizen of

Texas; Robert Bulger, M.D., a citizen of Texas; Michael Champine, M.D., a citizen of Texas; Ramsey Choucair, M.D., a citizen of Texas; C. Spencer Cochran, M.D., a citizen of Texas; Fadi C. Constantine, M.D., a citizen of Texas; Charles Cook, M.D., a citizen of Texas; Jorge Corona, M.D., a citizen of Texas; Alexandra Dresel, M.D., a citizen of Texas; John Early, M.D., a citizen of Texas; David Ewalt, M.D., a citizen of Texas; Brian Feagins, M.D., a citizen of Texas; Christopher D. Fetner, M.D., a citizen of Texas; Dan French, M.D., a citizen of Texas; Jemin Gajipara, M.D., a citizen of Texas; Bradford Gamble, M.D., a citizen of Texas; John Gill, M.D., a citizen of Texas; John Gilmore, M.D., a citizen of Texas; Gary Goldsmith, M.D., a citizen of Texas; Cori Grantham, M.D., a citizen of Texas; Patrick Hodges, M.D., a citizen of Texas; Ginger Isom-Batz, M.D., a citizen of Texas; Richard Jackson, M.D., a citizen of Texas; Sean M. Jones-Quaidoo, M.D., a citizen of Texas; Randall Kirby, M.D., a citizen of Texas; Kevin Kruse, M.D., a citizen of Texas; Grace Kumar, M.D., a citizen of Texas; Stephen Landers, M.D., a citizen of Texas; Mark Ledoux, M.D., a citizen of Texas; Benzel MacMaster, M.D., a citizen of Texas; Harold O'Dell Marshall, Jr., M.D., a citizen of Texas; James Merritt, M.D., a citizen of Texas; Chris Miskovsky, M.D., a citizen of Texas; Presley Mock, M.D., a citizen of Texas; James Montgomery, M.D., a citizen of Texas; Mitchell O. Moskowitz, M.D., a citizen of Texas; Keith D. Newman, M.D., a citizen of Texas; Hamlet Newsom, M.D., a citizen of Texas; John Noack, M.D., a citizen of Texas; Scott Paschal, M.D., a citizen of Texas; F. Corry Payne, M.D., a citizen of Texas; Todd Pollock,

M.D., a citizen of Texas; Patrick Pownell, M.D., a citizen of Texas; Anupam Pradhan, M.D., a citizen of Texas; Bryan Pruitt, M.D., a citizen of Texas; John Racanelli, M.D., a citizen of Texas; Kenneth Reed, M.D., a citizen of Texas; Renaud Rodrigue, M.D., a citizen of Texas; Robert Scheinberg, M.D., a citizen of Texas; Venkat Sethuraman, M.D., a citizen of Texas; Andrew K. Simpson, M.D., a citizen of Texas; James Sterling, M.D., a citizen of Texas; Jason Taub, M.D., a citizen of Texas; Steve Thornton, M.D., a citizen of Texas; Ben Tittle, M.D., a citizen of Texas; Maria Turnage, M.D., a citizen of Texas; William Vandiver, M.D., a citizen of Texas; James Walter, M.D., a citizen of Texas; Nathan Walters, M.D., a citizen of Texas; Richard Weiner, M.D., a citizen of Texas; Steven White, M.D., a citizen of Texas; and Kelly Will, M.D., a citizen of Texas; and

C. Value Management Group, LLC ("VMC"), a limited liability company organized in Texas in 1995.  VMC maintains and operates its principal place of business in Dallas, Texas, which is also VMC's "nerve center" and the place where VMC's managing members direct, control, and coordinate VMC's activities.  VMC's members are the following individuals: Aaron Murski, a citizen of Texas; Elliott Jeter, a citizen of Texas; Gregory S. Koonsman, a citizen of Texas; James Rolfe, a citizen of Tennessee; Jennifer Johnson, a citizen of Texas; John Trabold, a citizen of Texas; Kevin Florenz, a citizen of Texas; Kevin McDonough, a citizen of Texas; Stephan Peron, a citizen of Texas; Todd J. Sorenson, a citizen of Tennessee; and Vincent Kickirillo, a citizen of Texas.

7. Defendant John Vincent Zipper ("Dr. Zipper") is an individual who is a citizen of Texas, where he resides at 6905 Brookshire Drive, Dallas, Texas.

## VI.

## FACTUAL BACKGROUND

8. The management of a patient's airway and the patient's recovery and ability to breathe for herself are central to the responsibilities of the anesthesiologist, physicians, hospital and nursing staff during surgery. "*There is one skill above all else that an anaesthetist is expected to exhibit and that is to maintain the airway impeccably.*" (M. Rosen and I. P. Latto, 1984). Indeed, the seal used by the American Society of Anesthesiologists includes one word: "VIGILANCE." The defendants' conduct in this case can best be characterized as a complete and total lack of vigilance.

9. Defined as the entry of liquid or solid material into the trachea and lungs, anesthesia-related aspiration occurs when patients without sufficient laryngeal protective reflexes passively or actively regurgitate gastric contents. Aspiration of solid material requires immediate pharyngeal and endotracheal suction. Successful intraoperative management of pulmonary aspiration requires a high index of suspicion and immediate response. The first step in successful management of an intraoperative aspiration is the immediate recognition of gastric content in the oropharynx or the airways. Additional signs of potential aspiration include persistent hypoxia, high airway pressures, bronchospasm, and abnormal breath sounds following intubation.

10. Acute intraoperative aspiration is a known potentially fatal complication with significant associated morbidity. Awareness of the risk factors, predisposing

conditions, maneuvers to decrease risk and immediate management options by both the surgeon and the anesthesia team is imperative to reducing risk and optimizing patient outcomes associated with acute intraoperative pulmonary aspiration. The key to minimizing the impact of acute intraoperative aspiration is to prevent it from happening. Improper decision-making, lack of experience and lack of knowledge on the part of physicians, nurses and anesthesiologists are typically to blame for the majority of intraoperative aspiration events.

11. Studies have shown that hypoxia is the most common cause of airway-related deaths and serious injuries. To prevent hypoxemia, ASA Practice Guidelines for Postanesthetic Care provide that routine assessment and monitoring of nausea and vomiting should be done during emergence and recovery. If vomit appears in the mouth or pharynx in a patient who is supine, drugged or semi-conscious, then the possibility of aspiration should be investigated

12. On April 30, 2016, 36-year old Tyra slipped and fell at her place of work, causing injuries to her right ankle. Tyra consulted with an orthopaedic surgeon (Dr. Benzel C. MacMaster), who diagnosed Tyra with an ankle fracture, and scheduled Tyra for surgery.

13. On May 20, 2016, Tyra underwent open reduction internal fixation (ORIF) surgery on her right ankle at TIFS. The surgery at TIFS was performed by Dr. MacMaster, and the anesthesiologist was Dr. Zipper. At the time of the surgery, Tyra was morbidly obese (5'9", 240 lbs. and BMI of 35+).

14. General anesthesia began around 3:21 p.m., and the surgery lasted more than two hours. Sometime near the end of the surgery, Dr. Zipper told Dr. MacMaster that Tyra "was in stable condition." Dr. MacMaster departed the operating room (OR), and never returned.

15. Tyra began to emerge from general anesthesia around 6:01 p.m., about four minutes after the ankle surgery ended. At that time, Tyra was still in the OR on the OR table, and in the care, custody and control of Dr. Zipper and a single registered nurse (RN) who had received her nursing license in Texas just 13 months earlier.

16. While emerging from general anesthesia between 6:01 p.m. and 6:04 p.m. (approx.), Tyra became agitated, started kicking, and was biting on the laryngeal mask airway (LMA) that Dr. Zipper had used to administer anesthesia during the surgery. Tyra also scratched herself to the point where she had an open skin tear on her left rib cage. Dr. Zipper decided to remove the LMA, and provided Tyra with oxygen to assist with her breathing.

17. Between 6:04 p.m. and 6:06 p.m. (approx.), Tyra became combative again (for the second time). She tried to sit up; tried to bite the RN; refused to use the oxygen that Dr. Zipper had offered after the LMA was removed; pulled the IV out of her arm; and vomited for the first time. Overwhelmed, untrained and physically unable to handle the situation by herself, the RN called TIFS's Postanesthesia Care Unit (PACU) for help. Several PACU staff members soon arrived in the OR, where they forcibly held Tyra on her right side as an IV was reestablished on her right hand. Inexplicably, the PACU staff then left the OR and returned to the PACU.

18. Minutes later (between 6:06 p.m. and 6:08 p.m. approx.), Tyra became agitated again (for the third time), pulled the IV out of her hand (for the second time) and vomited again (for the second time) through her mouth and nose. Dr. Zipper noted that Tyra's blood oxygen levels were dropping, but took no corrective action. For the second time in less than 5 minutes, the RN had to call PACU for help. When the PACU staff again arrived at Tyra's bedside in the OR, Tyra was again rolled onto her right side (for the second time).

19. Dr. Zipper and a charge nurse discussed transferring Tyra from TIFS to the adjacent Dallas Presbyterian Hospital. Dr. Zipper called for a glidescope to be brought from another facility to assist with intubating Tyra during the transfer. Within a few moments (between 6:08 p.m. and 6:09 p.m. approx.), Tyra became combative again (for the fourth and final time), and she was "frothing" from her mouth and nose. Tyra sat up for about 30 seconds, and then collapsed. The charge nurse found Tyra to be unresponsive and could find no signs of a pulse. A Code Blue was called at 6:09 p.m. and Dr. Zipper didn't intubate Tyra until 6:11 p.m. (after Tyra had Coded). For the first time, Dr. Zipper suctioned Tyra's airway where he removed a large amount of material that had obstructed Tyra's airway. Tyra remained in a flatline condition for 24 minutes between 6:09 p.m. and 6:33 p.m. (approx.) Once Tyra's pulse was restored, TIFS called 911, and paramedics soon arrived to transport Tyra from the OR at TIFS to the emergency department at nearby Dallas Presbyterian Hospital, where Tyra arrived at around 6:48 p.m.

20. Chest x-rays taken at about 7:14 p.m. showed that both of Tyra's lungs were filled with dense alveolar infiltrates. A CT Angiogram (CTA) taken at about 8:17 p.m. showed that extensive consolidations were present within both of Tyra's lungs, and Tyra may have suffered aspiration pneumonitis.

21. On May 22-23, 2016, two cardiologists at Presbyterian Hospital of Dallas agreed that Tyra had most likely suffered asystolic arrest due to profound hypoxemia from aspiration. A third cardiologist at Memorial Hermann Hospital in Houston also concluded that Tyra's heart was structurally normal, and the most likely etiology of Tyra's cardiac arrest was profound hypoxemia leading to asystole (flatline).

22. Tyra's post-cardiac arrest medical diagnosis was moderate to severe, nonspecific, diffuse encephalopathy.

## VII.

## AGENCY

23. At all relevant times, the nurses, staff and physicians at TIFS who provided, managed, supervised and/or delivered medical care for Tyra on May 20, 2016 were the agents, representatives and/or employees of TIFS and acting within the scope of such agency/employment. Under the doctrines or agency and respondeat superior, TIFS is liable for the acts and omissions of these nurses, staff and physicians.

24. At all relevant times, Dr. Zipper was also the actual, ostensible or apparent agent, representative and/or employee of TIFS, by virtue of the fact that TIFS voluntarily assumed a legal responsibility–a duty it otherwise did not owe–to obtain Tyra's written consent to anesthesia using a form that bears TIFS' corporate logo and makes no mention

of Dr. Zipper, other than to say that anesthesia during Tyra's surgery would be provided by an unnamed "anesthesia provider" selected by TIFS without Tyra's participation or involvement in the selection process.  The form that TIFS presented to Tyra for Tyra's signature does <u>not</u> tell Tyra that the unnamed "anesthesia provider" who would be selected and provided by TIFS would be an independent contractor, thereby impliedly representing and holding out that the person who was going to administer the anesthesia (Dr. Zipper) was an agent of TIFS.

## VIII.

## FIRST CLAIM FOR RELIEF
## PROFESSIONAL NEGLIGENCE

### (MEDICAL MALPRACTICE)

25. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 24 of this complaint as if fully set forth herein.

26. On May 20, 2016, 36-year old Tyra underwent what was supposed to be routine surgery on her broken right ankle.  About two and one-half hours later, Tyra was still in the operating room when she became hypoxic, and flatlined for more than 20 minutes, causing profound and permanent anoxic brain injuries.

27. General anesthesia was administered during the surgery by the defendants. The standard of care during emergence from general anesthesia required the defendants to maintain Tyra's airway (i.e., ensure that Tyra was able to breathe on her own, and her airway was not blocked).  The defendant's conduct on May 20, 2016 fell below the standard of care, because Tyra couldn't breathe.  The defendants weren't ready to respond to reasonably foreseeable complications, and they failed to timely or properly

respond to those complications when they did occur.

28. Specifically, the defendants (1) didn't anticipate that a morbidly obese patient might vomit during emergence from general anesthesia; (2) weren't ready to suction–and did not timely or properly suction–Tyra's airway after she aspirated; (2) failed to observe warning signs that Tyra had aspirated and was quickly becoming hypoxemic; (3) failed to take immediate action to correct Tyra's hypoxemic condition; and (4) administered an excessive dose of a medication (Labetalol) that only worsened Tyra's lethal medical condition.

29. The defendants' negligent, careless and/or reckless conduct caused Tyra to suffer moderate to severe, nonspecific, diffuse anoxic/hypoxic encephalopathy (brain damage), because: (1) the aspiration of vomit blocked Tyra's airway; (2) Tyra's blocked airway prevented Tyra from breathing properly; (3) Tyra's inability to breathe properly resulted in inadequate amounts of oxygen in her blood; (4) the lack of oxygen in Tyra's blood led to profound hypoxemia; (5) the hypoxemia caused Tyra to flatline (asystolic) moments after the Labetalol was administered; (6) the Labetalol made it more difficult for medical staff to quickly resuscitate Tyra; (7) leaving Tyra without a pulse for more than 22 minutes.

30. The defendants' negligent, careless and/or reckless conduct included the following:

A. Failure to properly and fully assess Tyra's physical condition and associated risk factors before surgery began;

B. Failure to properly and fully assess whether Tyra's morbid obesity was a condition that should have excluded her as a candidate for surgery on May 20, 2016;

C. Failure to properly and fully assess whether Tyra's morbid obesity called for extra precautions to be taken to prevent aspiration and ensuing hypoxemia;

D. Failure to appreciate and recognize the risks of aspiration and hypoxemia in a morbidly obese patient;

E. Failure to promptly provide Tyra with timely and appropriate treatment;

F. Failure to establish and maintain control of Tyra's airway;

G. Failure to anticipate, recognize, plan for, prepare for, document and be ready to respond to reasonably foreseeable complications that might occur;

H. Failure to quickly and properly investigate whether Tyra aspirated;

I. Failure to suction Tyra's airway immediately after she aspirated;

J. Failure to suction Tyra's airway until after Tyra flatlined;

K. Failure to ensure there was a functioning pulse oximeter;

L. Failure to monitor Tyra's condition during and after surgery;

M. Failure to monitor and record pulse oximeter readings;

N. Failure to monitor and document Tyra's breathing;

O. Failure to monitor and document Tyra's blood oxygen levels;

P. Failure to timely and properly intubate until after Tyra flatlined;

Q. Failure to follow established protocols after Tyra aspirated;

R. Administering an excessive dose of Labetalol seconds before Tyra flatlined;

S. Failure to make accurate, complete and thorough records which fully document the details of Tyra's medical care while she was in the exclusive custody and control of defendants;

T. Failure to provide clear directives and procedures to be followed during surgery and anesthesia;

U. Failure to ensure proper medications were immediately available;

V. Failure to ensure proper equipment was immediately available;

W. Failure to follow appropriate nursing practices and standards, including being an advocate for Tyra;

X. Failure to staff the surgical facility with appropriate levels of qualified, trained and experienced personnel; and

Y. Failure to employ, train and supervise competent staff who knew how to respond to aspiration during and after anesthesia.

31. Tyra's injuries would not have occurred but for the negligent, careless and/or reckless conduct of the defendants.

32. As a direct and proximate result of the acts or omissions described above, singularly and collectively, Tyra suffered severe brain injuries, and plaintiff was legally obligated to pay (and is still paying) substantial workers compensation benefits in an amount which is currently far in excess of $1,000,000. Tyra continues to receive appropriate medical care and treatment for her injuries, and the amount of plaintiff's damages is expected to increase substantially. Pursuant to section 417.001(b) of the Texas Labor Code, plaintiff's "subrogation interest is limited to the amount of the total

benefits paid or assumed by the carrier to the employee or the legal beneficiary …"

## PRAYER

**WHEREFORE**, plaintiff prays for judgment against defendants as follows:

1. For general, compensatory and special damages in sums according to proof;

2. For interest on said sums as may be provided by law;

3. For reasonable attorney's fees as may be provided by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the court deems just and proper.

Respectfully submitted,

Dated:  February  1 , 2018                     s/ Jeffrey J. Williams

Jeffrey J. Williams, Esq. (Cal. Bar No. 156401)

**Attorneys for Plaintiff
Zenith Insurance Company**

**CHERNOW AND LIEB**
21255 Califa Street
Woodland Hills, CA 913677
Tel. (818) 592-3841
Email *jwilliams2@thezenith.com*


William B. Curtis, Esq. (Texas SBN 00783918)
**CURTIS LAW GROUP**
12225 Greenville Ave., Ste. 750
Dallas, TX  75230
Tel. (214) 890-1000
Email *BCurtis@Curtis-LawGroup.com*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as provided by Fed.R.Civ.P. Rule 38.

Respectfully submitted,

Dated:  February  1 , 2018  	             s/ Jeffrey J. Williams           

Jeffrey J. Williams, Esq. (Cal. Bar No. 156401)

**Attorneys for Plaintiff**
**Zenith Insurance Company**

**CHERNOW AND LIEB**
21255 Califa Street
Woodland Hills, CA 913677
Tel. (818) 592-3841
Email *jwilliams2@thezenith.com*

William B. Curtis, Esq. (Texas SBN 00783918)
**CURTIS LAW GROUP**
12225 Greenville Ave., Ste. 750
Dallas, TX  75230
Tel. (214) 890-1000
Email *BCurtis@Curtis-LawGroup.com*