IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ZENITH INSURANCE COMPANY, §
§
Plaintiff, §
§
V. § No. 3:18-cv-182-D
§
TEXAS INSTITUTE FOR SURGERY, §
L.L.P., et al., §
§
Defendants. §

## MEMORANDUM OPINION AND ORDER

Plaintiff Zenith Insurance Company ("Zenith") has filed a Motion to Compel Production of Documents by Defendant Texas Institute for Surgery, L.L.P. ("TIFS"), *see* Dkt. No. 36 (the "MTC"), which United States District Judge Sidney A. Fitzwater has referred to the undersigned United States magistrate judge for a hearing, if necessary, and for determination under 28 U.S.C. § 636(b), *see* Dkt. No. 38.

TIFS filed a response, *see* Dkt. No. 45; Zenith filed a reply, *see* Dkt. No. 55; and the Court heard oral argument on the MTC on August 15, 2018. *See* Dkt. No. 59.

For the reasons and to the extent explained below, the Court GRANTS in part and DENIES in part Plaintiff Zenith Insurance Company's Motion to Compel Production of Documents by Defendant Texas Institute for Surgery, L.L.P. [Dkt. No. 36].

# Background

The parties offer somewhat diverging accounts of the pertinent factual background and procedural background.

Zenith explains that

[t]his is a medical malpractice case. Subject matter jurisdiction is based on diversity of citizenship.

36-year old Tyra Price worked at a Dunkin Donuts in Dallas. One day at work, she fell and injured her ankle. Tyra made a claim for workers compensation benefits. Tyra's claim was accepted by plaintiff Zenith Insurance Company ("Zenith"), Tyra's workers compensation insurer.

Tyra underwent what should have been routine ankle surgery at Texas Institute for Surgery ("TIFS"). The surgery ended at 5:57 p.m. (See, TIFS' Answer, Doc. 17, p. 5, ¶ 14.) By 6:01 p.m. (only 4 minutes after the surgery ended) Tyra began showing signs that she was struggling to breathe. (Id., p. 6, ¶ 16-19.) By 6:09 p.m., Tyra was unresponsive and a Code Blue was called. (Id., ¶ 19.) Medical staff at TIFS eventually called 9-1-1, and an ambulance transported Tyra to a different hospital, where she remained in a coma for several weeks. Tyra suffered permanent anoxic brain injuries, and now requires lifetime care. Plaintiff alleges that the defendants failed to maintain Tyra's airway (i.e., she couldn't breathe), and failed to take corrective action when they observed Tyra struggling to breathe.

This motion addresses TIFS' refusal to produce 7 documents and 56 emails. The disputed items are highlighted in yellow in the Appendix, pages 1-22. In a case involving a patient who suffered devastating injuries, TIFS has turned over just 8 emails–including 3 pre-litigation email exchanges between TIFS and plaintiff. (Williams Decl., ¶ 3.) None of the 8 emails produced by TIFS address the medical care that was provided to Tyra. (Id.) TIFS is hiding all of its other emails behind an array of asserted privileges. TIFS has already had three chances to provide an adequate privilege log for the withheld items, and it has failed to do so. (Appx. 62-68 [first privilege log]; 72-80 [second privilege log]; and 104-125 [third privilege log].)
....

Plaintiff served a second set of requests for production of documents on defendant Texas Institute for Surgery ("TIFS") on March 13, 2018. (Appx. 23-37.) TIFS served its written responses on April 12, 2018. (Appx. 38-61.) TIFS produced some of the requested documents, but

withheld other documents and emails after asserting various privileges. TIFS also provided an initial privilege log. (Appx. 62-68.)

Plaintiff believed that TIFS' initial privilege log was inadequate, and asked TIFS to provide an amended log. (Appx. 69-70.) Counsel met and conferred on April 20, 2018, and TIFS agreed to provide an amended log. (Appx. 71.) TIFS provided a first amended privilege log and further responses on May 3, 2018. (Appx. 72-103.)

On May 18, 2018, TIFS provided a second amended privilege log. (Appx. 104-125.) According to that log, TIFS has withheld more than 100 documents and emails. 63 of the withheld documents and emails are the subject of this motion to compel. (See, Appx. 1-22 [disputed items are numbered and highlighted in yellow].)

....

TIFS has provided three privilege logs. Its first log (Appx. 62-68) took a "categorical approach" that only identified withheld emails in broad categories that made it impossible to test the merits of any of the alleged privileges asserted by TIFS. TIFS's second privilege log (Appx. 72-80) suffered from the same shortcomings. Similarly, TIFS' third and most recent privilege log (Appx. 104-125) is still inadequate, because it does not contain enough information to allow the plaintiff or the Court to determine whether the withheld materials are protected by the asserted privileges.

Dkt. No. 36 at 2-4; *see also* Dkt. No. 37 at 1-3.

In response, TIFS explains that

[t]his is a medical malpractice case involving the care and treatment of Tyra Price. Price underwent right ankle surgery at TIFS on May 20, 2016. Following surgery, Price had difficulty breathing, coded, and was transferred to Texas Health Presbyterian Hospital Dallas for further care. Plaintiff, the worker's compensation insurance carrier for Price's employer, alleges Price suffered permanent anoxic brain injuries. Plaintiff claims Price's injuries were caused by TIFS' alleged negligence, and the negligence of others, following Price's surgery.

In its initial disclosures and in responses to multiple requests for production, TIFS has produced over 1,500 pages of documents to Plaintiff. In addition, TIFS has provided Plaintiff's counsel with an itemized privilege log, detailing the privileged documents withheld by TIFS. Without a factual or legal basis, Plaintiff now accuses TIFS of "hiding documents" and argues the privilege log is insufficient. [See Plaintiff's Motion to Compel, Docket No. 36, at page 2].

Plaintiff seeks to compel production of 63 privileged communications and other documents from TIFS. Plaintiff does so, however, without even attempting to make the showing necessary to overcome the medical peer review committee privilege, the medical committee privilege, the work-product privilege, and the attorney-client privilege. Plaintiff neither acknowledges nor attempts to establish the extremely limited circumstances under which a court may consider production of privileged documents and communications protected by these privileges. Instead, Plaintiff maintains that the Court must take the extraordinary step of compelling production of TIFS' privileged documents based on "waiver." [See Plaintiff's Motion, Dckt. 36, at page 3].

Plaintiff further claims the privilege log provided by TIFS "does not contain enough information to allow the plaintiff or the Court to determine whether the withheld materials are protected by the asserted privileges." [See Plaintiff's Motion, Dckt. 36, at page 3-4]. A review of the privilege log shows that sufficient information is provided. And Plaintiff's argument is without merit. It seems disingenuous to claim, for example, that TIFS' "Report of Peer Review Committee's Findings to Medical Executive Committee," described in the privilege log as a "[o]ne-page report regarding the Peer Review Committee's investigation, assessment, and recommendations regarding the care provided to Tyra Price by Dr. [John Vincent] Zipper, [c]reated by Peer Review Committee and provided to Medical Executive Committee," fails to provide sufficient information for Plaintiff to understand why the document is shielded from discovery by the medical peer review committee privilege. [See Appx. to Plaintiff's Motion, Dckt. 37, at page 5.]

As set forth in its supporting brief, TIFS has met its burden of establishing a prima facie case that the documents withheld are privileged.

....

The documents withheld by TIFS are all identified in its Second Amended and Supplemental Privilege Log. [Appx. page 142–163]. The Affidavits of: (1) Christie Bueno, RN, BSN, (2) Melissa Gonzalez, CPCS, and (3) John Croley, JD, establish a prima facie case that applicable privileges prohibit disclosure of the documents requested. [Appx. page 1–141]. Further, TIFS is ready and prepared to provide the privileged documents to the Court for in camera inspection if the Court determines that is necessary.

Because TIFS has met its initial burden of establishing a prima facie case that privileges apply, Plaintiff (as the party seeking access to privileged information) has the burden to establish that the privilege does not apply, including any waiver. TEX. OCC. CODE § 160.007(g). Plaintiff has not met this burden, and no waiver has occurred.

Dkt. No. 44 at 1-2; Dkt. No. 45 at 1.

In reply, Zenith in turn explains that

> [w]hile an in camera inspection could be appropriate, TIFS "still must provide 'a detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure'" before any in camera review is warranted. (*Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473-474 (N.D. Tex. 2004) [internal citations omitted].) For the reasons set forth below, plaintiff respectfully submits that the affidavits supplied by TIFS do not provide the required information necessary to establish the claimed privileges.
> ....
> TIFS has offered no evidence to support its work product objections as to items 1-2, 7-31, 39-41 and 47-53. Those objections should be overruled, although other objections remain. TIFS has also offered no evidence of any kind to support its objections regarding items 8-9, so production of those items should be compelled. In addition, based on the affidavits provided by TIFS, plaintiff withdraws its motion to compel as it relates to items 3-4, 36-38 and 43-46 only.

Dkt. No. 55 at 1 & n.1.

At oral argument, TIFS's counsel represented that TIFS would produce the documents numbers as Items 8 and 9 on the privilege log filed as Dkt. No. 46 at 152 of 164 – taking those previously withheld document out of dispute in resolving Zenith's MTC – and confirmed that, as to the documents still in dispute, TIFS is pressing only claims of work product protection or Texas medical peer review and medical committee privilege as supported by the affidavits accompanying TIFS's response to the MTC.

## Legal Standards

I. <u>Requests for Production, Interrogatories, and Motions to Compel</u>

The Federal Rules of Civil Procedure control the scope of a proper discovery request in the form of requests for production and interrogatories.

Under Rule 26(b)(1), "[u]nless otherwise limited by court order, ... [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." FED. R. CIV. P. 26(b)(1); *accord Booth v. City of Dallas*, 312 F.R.D. 427, 433 (N.D. Tex. 2015).

"The 2015 amendments to Rule 26 deleted 'from the definition of relevance information that appears 'reasonably calculated to lead to the discovery of admissible evidence' because '[t]he phrase has been used by some, incorrectly, to define the scope of discovery' and 'has continued to create problems' given its ability to 'swallow any other limitation on the scope of discovery.'" *State Auto. Mut. Ins. Co. v. Freehold Mgmt., Inc.*, No. 3:16-cv-2255-L, 2018 WL 3548866, at *2 (N.D. Tex. July 24, 2018) (quoting *Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 319064, at *4 (E.D. Tex. Jan. 23, 2017) (quoting FED. R. CIV. P. 26, 2015 comm. note)).

"Under Rule 26(b)(1), [as amended,] discoverable matter must be both relevant and proportional to the needs of the case – which are related but distinct requirements." *Samsung Electronics Am., Inc. v. Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017). "To be relevant under Rule 26(b)(1), a document or information need not, by

itself, prove or disprove a claim or defense or have strong probative force or value. If it were otherwise, it would make little sense for Rule 26(b)(1) to direct courts to consider whether discovery that is relevant to any party's claim or defense is also important in resolving the issues." *Id.* at 280.

Federal Rule of Civil Procedure 37(a) governs motions to compel discovery responses. Rule 37(a)(3)(B) provides that a party seeking discovery may move for an order compelling production against another party when the latter has failed to produce documents requested under Federal Rule of Civil Procedure 34. *See* FED. R. CIV. P. 37(a)(3)(B)(iv); *accord Crosswhite v. Lexington Ins. Co.*, 321 F. App'x 365, 368 (5th Cir. 2009) ("A party may move to compel production of materials that are within the scope of discovery and have been requested but not received. FED. R. CIV. P. 37(a). Yet, a court may decline to compel, and, at its option or on motion, 'may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden…, including … forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters.' FED. R. CIV. P. 26(c)(1)(D); *see also* FED. R. CIV. P. 37(a)(5)(B)."). For purposes of Rule 37(a), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." FED. R. CIV. P. 37(a)(4).

As to requests for production or inspection, Federal Rule of Civil Procedure 34(a)(1) provides that "[a] party may serve on any other party a request within the scope of Rule 26(b): (1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's

possession, custody, or control: (A) any designated documents or electronically stored information – including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilation – stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or (B) any designated tangible things." FED. R. CIV. P. 34(a).

In response to a Rule 34(a) request, "[f]or each item or category, the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." FED. R. CIV. P. 34(b)(2)(B). And, "[i]n responding to [Rule 34] discovery requests, a reasonable inquiry must be made, and if no responsive documents or tangible things exist, FED. R. CIV. P. 26(g)(1), the responding party should so state with sufficient specificity to allow the Court to determine whether the party made a reasonable inquiry and exercised due diligence," *Heller*, 303 F.R.D. at 485.

General or boilerplate objections are invalid, and "[o]bjections to discovery must be made with specificity, and the responding party has the obligation to explain and support its objections. Amended Federal Rule of Civil Procedure 34(b)(2) effectively codifies this requirement, at least in part: 'An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest.'" *OrchestrateHR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 507 (N.D. Tex. 2016) (citing

*Heller*, 303 F.R.D. at 483; quoting FED. R. CIV. P. 34(b)(2)(C)), *objections overruled*, No. 3:13-cv-2110-KS, 2016 WL 5942223 (N.D. Tex. Oct. 13, 2016).

A party resisting discovery must show how the requested discovery is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005); *see also S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request."). "Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Heller*, 303 F.R.D. at 490.

And, although Rule 26(b)(1) includes only "nonprivileged matter" within the proper scope of discovery, FED. R. CIV. P. 26(b)(1), "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim," FED. R. CIV. P. 26(b)(5)(A).

Once responses, answers, and objections have been served subject to Rule 26(g), the party who has objected to a discovery request then must, in response to a Rule 37(a) motion to compel or in support of its own Federal Rule of Civil Procedure 26(c) motion for a protective order, urge and argue in support of its objection to an

-9-

interrogatory or request, and, if it does not, it waives the objection. *See OrchestrateHR*, 178 F. Supp. 3d at 507 (citing *Dolquist v. Heartland Presbytery*, 221 F.R.D. 564, 568 (D. Kan. 2004); *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 662 (D. Kan. 1999)).

Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel is granted, or if the requested discovery is provided after the motion was filed, "the court must, after giving an opportunity to be heard, require the party ... whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," except that "the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A); *accord Washington v. M. Hanna Const. Inc.*, 299 F. App'x 399, 402 (5th Cir. 2008).

Federal Rules of Civil Procedure 37(a)(5)(B) and 37(a)(5)(C) further provide in pertinent part that, "[i]f the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party ... who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees," "[b]ut the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust," and that, "[i]f the

motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." FED. R. CIV. P. 37(a)(5)(B)-(C); *accord De Angelis v. City of El Paso*, 265 F. App'x 390, 398 (5th Cir. 2008).

"[A] motion is 'substantially justified' if there is a genuine dispute, or if reasonable people could differ as to [the appropriateness of the contested action]." *De Angelis*, 265 F. App'x at 398 (internal quotation marks omitted); *see also Heller*, 303 F.R.D. at 477.

II. Attorney Work Product

The following legal standards govern Defendants' assertion of work-product protection:

> [T]he issue of whether documents are exempt from discovery under the attorney work product doctrine is governed by federal law in diversity cases because work product is not a substantive privilege within the meaning of Federal Rule of Civil Procedure 501. The federal work product doctrine, as codified by Federal Rule of Civil Procedure 26(b)(3), provides for the qualified protection of documents and tangible things prepared by or for a party or that party's representative "in anticipation of litigation or for trial." A document need not be generated in the course of an ongoing lawsuit in order to qualify for work product protection. But "the primary motivating purpose" behind the creation of the document must be to aid in possible future litigation. As the advisory committee notes to Rule 26(b)(3) make clear, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision."
>
> Among the factors relevant to determining the primary motivation for creating a document are "'the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance.'" If the document would have been created without regard to whether litigation was

expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation.

        Like all privileges, the work product doctrine must be strictly construed. The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial. A general allegation of work product protection is insufficient to meet this burden. Instead, "'a clear showing must be made which sets forth the items or categories objected to and the reasons for that objection.'" The proponent must provide sufficient facts by way of detailed affidavits or other evidence to enable the court to determine whether the documents constitute work product. Although a privilege log and an in camera review of documents may assist the court in conducting its analysis, a party asserting the work product exemption still must provide "a detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure." In fact, "'resort to in camera review is appropriate only *after* the burdened party has submitted detailed affidavits and other evidence to the extent possible.'"

*OrchestrateHR, Inc. v. Trombetta*, No. 3:13-cv-2110-P, 2014 WL 884742, at *2 (N.D. Tex. Feb. 27, 2014) (citations omitted).

      "If a party meets its burden and proves that the materials sought warrant work product protection, the party seeking discovery must prove why those materials should still be produced." *S.E.C. v. Brady*, 238 F.R.D. 429, 443 (N.D. Tex. 2006). Rule 26(b)(3) instructs the court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." FED. R. CIV. P. 26(b)(3)(B). A party may only obtain discovery of documents prepared in anticipation of litigation or for trial upon showing that the party seeking discovery has (1) substantial need of the materials to prepare for its case and (2) that the party cannot obtain the substantial equivalent of the materials by other means without undue hardship. *See* FED. R. CIV. P. 26(b)(3)(A) ("Ordinarily, a

party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

(i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.").

III.   <u>Texas State Law Privileges</u>

But, because this is a diversity case applying Texas law, Texas state law's substantive evidentiary privileges apply under Federal Rule of Evidence 501. *See* FED. R. EVID. 501 ("But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). This includes Texas's medical peer review committee privilege and medical committee privilege.

Texas Health and Safety Code § 161.032(a) creates an evidentiary privilege from disclosure in discovery: "The records and proceedings of a medical committee are confidential and are not subject to court subpoena." TEXAS HEALTH AND SAFETY CODE § 161.032(a). Under Texas law, the term "medical committee" under the Texas Health and Safety Code is broadly defined, *see In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 718-19 (Tex. 2015), and, under Section 161.032(a), being "confidential" means that a record or proceeding is not subject to discovery – unless, if it is also subject to Texas Occupations Code § 160.007(a) as the records and proceedings of a medical peer review committee, it is found by a judge to be "relevant to an anticompetitive action, or to a

-13-

civil rights proceeding brought under 42 U.S.C. Section 1983." TEXAS OCC. CODE §

160.007(b). That exception does not apply here. For its part, Texas Occupations Code

§ 160.007(a)'s medical peer review privilege states that, "[e]xcept as otherwise provided

by this subtitle, each proceeding or record of a medical peer review committee is

confidential, and any communication made to a medical peer review committee is

privileged." TEXAS OCC. CODE § 160.007(a).

As another judge in this district has summarized,

> [u]nder Texas law, the records and proceedings of a medical committee
> are privileged from disclosure by statute. Tex. Health & Safety Code Ann.
> § 161.032 (West Supp. 2015); Tex. Occ. Code Ann. § 160.007 (West 2012).
> A medical peer review committee is a committee, governing board, or
> medical staff of a health care entity that operates under written bylaws
> approved by the entity's governing board. Tex. Occ. Code Ann. §
> 151.002(a)(8) (West Supp. 2015). Medical committees evaluate the quality
> of medical and health care services or the competence of physicians, while
> medical peer review committees may evaluate medical and health
> services, including the evaluation of the qualifications of professional
> health care practitioners and of patient care. Tex. Occ. Code §§
> 151.002(a)(8), 151.002(a)(7); *Valley Reg'l Med. Ctr. v. Wright*, 61 Fed.
> Appx. 121, *2 (5th Cir. 2003) (citing *Ebony Lake Healthcare Ctr. v. Texas
> Dep't of Human Servs.*, 62 S.W.3d 867, 871-72 (Tex. App. – Austin 2001,
> no pet)).
>     The protection of the medical committee privilege and peer review
> privilege exist in order to ensure that "exacting critical analysis of the
> competence and performance of physicians and other health-care
> providers by their peers will result in improved standards of medical care;
> and ... an atmosphere of confidentiality is required for candid, uninhibited
> communication of such critical analysis within the medical profession."
> *Garza v. Scott & White Mem'l Hosp.*, 234 F.R.D. 617, 626 (W.D. Tex.
> 2005) (citing *Memorial Hospital-The Woodlands v. McCown*, 927 S.W.2d
> 1, 3 (Tex. 1996)). The medical committee privilege states that the records
> and proceedings of a medical committee are confidential. Tex. Health &
> Safety Code § 161.032. Ultimately all deliberations of a hospital
> committee are protected from discovery. *Manthe v. VanBolden*, 133
> F.R.D. 497, 499 (N.D. Tex. 1991) (citing *Texarkana Memorial Hospital,
> Inc. v. Jones*, 551 S.W.2d 33, 35 (Tex. 1977)). The medical committee

privilege protects all documents generated by the committee in conducting a review, documents prepared at the direction of the committee for committee purposes, documents submitted to the committee, minutes of the committee, correspondence between committee members, and any final committee product. *Jordan v. Court of Appeals*, 701 S.W.2d 644, 647-648 (Tex. 1985). The medical peer review privilege states that each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged, except as otherwise provided in the statute. Tex. Occ. Code § 160.007. Therefore, any communications or records made during a medical peer review are confidential. *See In re Living Centers of Texas, Inc.*, 175 S.W.3d 253 (Tex. 2005).

*Rickman v. Moore*, No. 7:16-cv-25-O, 2016 WL 9559892, at *2 (N.D. Tex. Nov. 2, 2016).

As to the medical peer review privilege more specifically, the Texas Supreme

Court has recently summarized the governing Texas law:

> A medical peer review committee includes "a committee of a health care entity [including a hospital licensed under Chapter 241 or 577 of the Health and Safety Code] ... or the medical staff of a health care entity" that (1) "operates under written bylaws" approved by either the policy-making or governing board of the health care entity, and (2) "is authorized to evaluate the quality of medical and health care services or the competence of physicians."
>
> "All proceedings and records of a medical peer review committee are confidential, and all records of, determinations of, and communications to a committee are privileged and are not discoverable, with certain exceptions...." The provision of confidentiality extends to the committee's initial and subsequent credentialing decisions, as well as to documents "generated" by a committee or "prepared by or at the direction of the committee for committee purposes." The minutes and recommendations of the committee as well as the committee's inquiries about a physician to outside sources and responses thereto are also protected. However, "simply passing a document through a peer review committee does not make it privileged." The privilege does not prevent a party from discovering from a nonprivileged source material that has been presented to the committee.
>
> Texas Occupations Code section 160.007's provisions "expressly delineate and limit the circumstances under which the records of and communications to a peer review committee may [or must] be accessed." The committee may disclose its records and proceedings, and

communications made by the committee to other medical peer review committees, appropriate governmental agencies, national accreditation bodies, the Texas Medical Board, and another state's board of registration or licensing of physicians. The committee may disclose to a physician under its review confidential information relevant to the matter without waiving confidentiality. The committee must provide the physician with a written copy of its recommendation and final decision for certain actions, including those that could result in "censure, suspension, restriction, limitation, revocation, or denial of membership or privileges in a health care entity." Certain parties are entitled to use the confidential information in their defense or in rebuttal to such a defense. Otherwise, the records and determinations of a medical peer review committee, as well as communications to the committee, are "not subject to subpoena or discovery and [are] not admissible as evidence in any civil judicial or administrative proceeding without waiver of the privilege of confidentiality executed in writing by the committee."

However, under certain circumstances, the information may not be confidential, in which case it would not be subject to a privilege. For example, the "records made or maintained in the regular course of business by a hospital ... [or] medical organization" are not covered by section 160.007 and therefore are not confidential under that section.
....
With one exception, the medical peer review committee privilege affords confidential status to the records of, proceedings of, and communications to a medical peer review committee regardless of whether the individual record, proceeding, or communication relates to a peer review action.

*In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d at 698-700 (footnotes omitted).

This followed the Texas Supreme Court's prior explanation of the medical committee privilege and medical peer review privilege in *In re Living Centers of Texas, Inc.*:

> The medical committee privilege states:
>> The records and proceedings of a medical committee are confidential and are not subject to court subpoena.
> ...
> (f) This section and Subchapter A, Chapter 160, Occupations Code, do not apply to records made or maintained in the regular course of business....

Tex. Health & Safety Code § 161.032. A "medical committee" "includes any committee" of health care entities including an extended care facility. Id. § 161.031(a)(5). The medical peer review privilege states:

> (a) Except as otherwise provided by this subtitle, each proceeding or record of a medical peer review committee is confidential, and any communication made to a medical peer review committee is privileged.

Tex. Occ. Code § 160.007. A "medical peer review" committee is defined as:

> a committee of a health care entity ... that operates under written bylaws approved by the policy-making body or the governing board of the health care entity and is authorized to evaluate the quality of medical and health care services or the competence of physicians....

Id. § 151.002(a)(8). "Health care entity" includes nursing homes. Id. § 151.002(a)(5)(B). "Medical peer review" is defined as:

> "Medical peer review" or "professional review action" means the evaluation of medical and health care services, including evaluation of the qualifications of professional health care practitioners and of patient care provided by those practitioners....

Id. § 151.002(a)(7). "Practitioner" is defined in the Occupations Code to "include physicians and surgeons." Tex. Occ. Code § 151.002(b). Section 151.052, entitled "Exemptions," specifically excludes from the coverage of this subtitle (sections 151-165) nurses, dentists, optometrists, chiropractors, podiatrists, psychologists, and physical therapists. Tex. Occ. Code § 151.052(a). Applying both statutes shows that any "records or proceedings" of a medical committee (including a medical peer review committee) are confidential, but the privilege of the medical peer review committee also includes "any communication made to" the committee. Id. § 160.007(a).

This Court has analyzed the records, proceedings, and communications language of the medical committee privilege and the medical peer review committee privilege under Health & Safety Code section 161.032. *McCown*, 927 S.W.2d at 3; *Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12, 16 (Tex. 1996); *In re Univ. of Tex. Health Ctr.*, 33 S.W.3d 822, 825 (Tex. 2000) (per curiam). In *McCown*, we discussed both the medical committee privilege and the medical peer review privilege, holding "the confidentiality provision of [the medical committee privilege] extends to initial credentialing by medical committees." *McCown*, 927 S.W.2d at 3-5. Other confidential documents under the medical peer review privilege are those "generated" by a committee or "prepared by or at the direction of the committee for committee purposes." *Id.* at 10. Privileged documents in *McCown* included the "minutes and

recommendations" of medical committees, the hospital's inquiries about a physician to other sources and the sources' responses, and communications between the physician and the hospital. *Id.* at 11; *see Brownwood Reg'l Hosp. v. Eleventh Court of Appeals*, 927 S.W.2d 24, 27-28 (Tex. 1996) (per curiam) (holding the minutes of the board of trustees and the credentialing and subsequent review of physicians were privileged, but "the bylaws, rules, and regulations" of the hospital staff were not).

This Court held similarly in *Brooks*, adding that simply passing a document through a peer review committee does not make it privileged. *Brooks*, 927 S.W.2d at 17, 18. Once again discussing both the medical committee privilege and the medical peer review privilege, in *In re University of Texas Health Center*, we held that evidence that "all of [the records] were created by or at the request of the committee in connection with its evaluation of medical care" was sufficient to make all of the documents privileged. *In re Univ. of Tex. Health Ctr.*, 33 S.W.3d at 825.

A statutory business records exception to both the medical committee and medical peer review committee privileges appears in Health & Safety Code section 161.032(f). Tex. Health & Safety Code § 161.032(f); *see Brooks*, 927 S.W.2d at 17, 18. It states, "This section and Subchapter A, Chapter 160, Occupations Code, do not apply to records made or maintained in the regular course of business by a hospital, ... or extended care facility." *Id.* § 161.032(f). "The reference to [§ 160.007 and § 161.032] in section 161.032 is a clear signal that records should be accorded the same treatment under both statutes in determining if they are made 'in the regular course of business.'" *McCown*, 927 S.W.2d at 11. Thus, business records excepted from the privileges include a "patient's medical records" and "business and administrative files and papers apart from committee deliberations." *See Brooks*, 927 S.W.2d at 18; *McCown*, 927 S.W.2d at 10.

While the medical privileges are important in promoting free discussion in the evaluation of health care professionals and health services, the right to evidence is also important, and therefore privileges must be strictly construed. *McCown*, 927 S.W.2d at 7 ("privileges are to be narrowly construed"); *Univ. of Penn. v. Equal Employment Opportunity Comm'n*, 493 U.S. 182, 189, 110 S. Ct. 577, 107 L. Ed. 2d 571 (1990) (privileges contravene the public's right to hear evidence and must be strictly construed).

Like other privileges, the medical peer review privilege will be strictly interpreted. Because the definition of "practitioner" under the Occupations Code is so narrowly drawn, we hold the medical peer review privilege, insofar as employment evaluation is concerned, only applies to physicians. *See* Tex. Occ. Code §§ 151.002(b), 151.052.

In addition to employment evaluation, a medical peer review committee has the broader authority "to evaluate the quality of medical and health care services...." *Id.* § 151.002(a)(8). We construe this statement to allow medical peer review committees to retrospectively review health-care services provided by non-physicians as well, such as the administration of drugs by a nurse at the instruction of a physician. The purpose of medical peer review, as the plain language of the statutes makes clear, is protection of an evaluative process, not mere records. *Cf. Jordan v. Fourth Court of Appeals*, 701 S.W.2d 644, 649 (Tex. 1985) (holding that documents "not shown to be 'records and proceedings' of a hospital committee" are discoverable); *McCown*, 927 S.W.2d at 9 ("[T]he statutory privilege attaches to an investigation, review, 'or other deliberative proceeding ' of a medical committee.") (citation omitted).
....

The peer review privilege is intended to extend far enough to foster candid internal discussions for the purpose of making improvements in the quality of care, but not so far as to permit the concealment of "routinely accumulated information." *Whittington*, 751 S.W.2d at 496 ("the statute protects only the deliberative process"). "[T]he privilege [does] not prevent discovery of material that ha[s] been presented to a hospital committee if it [is] otherwise available and 'offered or proved by means apart from the record of the committee.' " *McCown*, 927 S.W.2d at 10 ("[T]he privilege [does] not prevent discovery of material that ha[s] been presented to a hospital committee if it [is] otherwise available and 'offered or proved by means apart from the record of the committee.'") (quoting *Texarkana Mem'l Hosp.*, 551 S.W.2d at 36).

However, the source of nonprivileged material cannot be the peer review committee or any other entity or individual included within the protections of the committee privileges. Rather, a party must seek the documents and communications from a nonprivileged source. *Brooks*, 927 S.W.2d at 18. *Brooks* is properly read to privilege only the withholding of the fact that ordinary business records were reviewed by the committee, not the ordinary business records themselves. The peer review privilege protects the products of the peer review process: reports, records (including those produced for the committee's review as part of the investigative review process), and deliberations.

175 S.W.3d at 256-58, 260 (footnotes omitted).

# Analysis

As noted above and as Zenith summarized in reply, *see* Dkt. No. 55 at 11, as to the documents still in dispute, TIFS is pressing only claims of work product protection or Texas medical peer review and medical committee privilege as supported by the affidavits accompanying TIFS's response to the MTC. The Court will address these documents, which are itemized by number on the privilege log filed as Dkt. No. 46 at 143-164 of 164, in turn based on the protection or privilege that TIFS claims as to each.

## I. Texas Medical Peer Review Committee and Medical Committee Privileges

### A. Items 1-2

TIFS offers the Affidavit of Christie Bueno RN, BSN [Dkt. No. 46 at 2-70 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 1-2 are protected by the state law medical peer review and medical committee privileges.

Zenith replies that, in Ms. Bueno's affidavit, the two documents listed as Items 1 and 2

> are described as "confidential" letters that TIFS sent to Dr. Zipper, telling Zipper that TIFS was conducting an investigation (item 1) and that he had the right to participate in the investigation (item 2). (Bueno Aff., ¶ 14.) Nothing in Ms. Bueno's affidavit suggests that these letters contain information that (if disclosed) would violate the sanctity of the committee's deliberative process. These appear to be the kind of routinely-generated form letters that fall outside the scope of the privilege because they are unrelated to the deliberative process. Indeed, there is no contention in Ms. Bueno's affidavit that these documents were part of the deliberative process at all.

Dkt. No. 55 at 3-4.

The Court cannot agree with Zenith's restrictive view of the scope of these Texas state law privileges under the governing case law. These two letters are communications or documents generated by the committee in conducting a review.

TIFS has met its burden as to Items 1 and 2, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

B.      Item 5

TIFS offers the Affidavit of Melissa Gonzalez, CPCS [Dkt. No. 46 at 71-138 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Item 5 is protected by the state law peer review privilege.

Zenith replies that it

> does not dispute that the claimed privileges could conceivably apply to some of the documents in Dr. Zipper's credentialing file (item 6). However, TIFS has provided the Court with no information that would suggest every single piece of paper in Dr. Zipper's file is privileged. In fact, Ms. Gonzalez seems to make that point in her own affidavit when she says that the credentialing files "contain the type of documents" that are privileged. (Gonzalez Aff., ¶ 16.) That's a far cry from proof that Dr. Zipper's entire file is privileged.

Dkt. No. 55 at 6.

Again, under the governing precedent, the Court cannot agree with Zenith's view of the scope of the governing privileges. As the Court reads the Texas Supreme Court's most recent decisions, an entire credentialing file is privileged, even if some documents

(like a resume or CV) would not be privileged if located elsewhere. *See, e.g., Brooks*, 927 S.W.2d at 18, 20-21.

TIFS has met its burden as to Item 5, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

C.     Item 6

TIFS also offers Ms. Gonzalez's affidavit [Dkt. No. 46 at 71-138 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Item 6 is protected by the state law peer review privilege.

Zenith replies that

> [t]he credentialing file for nurse Paula Harrison (item 5) suffers from the same evidentiary infirmities described above. But in addition, nurse Harrison's credentialing file is not privileged, because unlike Dr. Zipper, Harrison is not a "physician."
>     The peer review privilege asserted by TIFS is found in Subtitle B of Title 3 of the Texas Occupations Code. That subtitle "does not apply to … a registered nurse or licensed vocational nurse engaged strictly in the practice of nursing in accordance with the applicable licensing acts and other laws of this state." (Tex. Occ. Code § 151.052(a)(4).) Likewise, "'[m]edical peer review' … means the evaluation of medical and health care services, including evaluation of the qualifications and professional conduct of professional health care practitioners and of patient care provided by those practitioners." (Tex. Occ. Code § 151.002(a)(7) [italics added].) And "the terms 'practitioner' and 'practitioner of medicine' include physicians and surgeons." (*Id.*, at 151.002(b).) Finally, "'[m]edical peer review committee' … means a committee … authorized to evaluate the quality of medical and health care services or the competence of physicians …" (Tex. Occ. Code § 151.002(a)(8) [italics added].) The term "physician" is defined as "a person licensed to practice medicine in this state." (*Id.*, at 151.002(a)(12).)

Because Paula Harrison is a nurse – not a physician or practitioner – her credentialing file (item 5) is not privileged, and should be produced. (*See, e.g.*, *In re Living Ctrs. of Tex.*, *supra*, 175 S.W.3d at 258 ["Like other privileges, the medical peer review privilege will be strictly interpreted. Because the definition of 'practitioner' under the Occupations Code is so narrowly drawn, we hold the medical peer review privilege, insofar as employment evaluation is concerned, only applies to physicians."])

Dkt. No. 55 at 7.

Here, the Court agrees with Zenith's analysis. Following *In re Living Centers of Texas, Inc.*, 175 S.W.3d 253 (Tex. 2005), the Court cannot accept TIFS's argument that "practitioner," as used in the Texas statute creating the peer review privilege, is so broad as to include a specially-trained nurse practitioner and certified registered nurse first assistant or allied health professional. *See In re Living Ctrs. of Tex.*, 175 S.W.3d at 258 ("Like other privileges, the medical peer review privilege will be strictly interpreted. Because the definition of 'practitioner' under the Occupations Code is so narrowly drawn, we hold the medical peer review privilege, insofar as employment evaluation is concerned, only applies to physicians."); TEX. OCC. CODE §§ 151.002(a)(12) ("'Physician' means a person licensed to practice medicine in this state."), 151.002(a)(13) ("'Practicing medicine' means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who: (A) publicly professes to be a physician or surgeon; or (B) directly or indirectly charges money or other compensation for those services."), 151.002(b) ("The terms 'physician' and 'surgeon' are synonyms. As used in this subtitle, the terms 'practitioner' and 'practitioner of medicine' include physicians and surgeons.").

TIFS has failed to meet its burden as to Item 6, as to which the Court GRANTS

Zenith's MTC and which TIFS must produce to Zenith's counsel.

D.     Item 7

TIFS offers Ms. Bueno's affidavit [Dkt. No. 46 at 2-70 of 164], in addition to

TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of

164], to support TIFS's assertion that Item 7 is protected by the state law medical peer

review and medical committee privileges.

Zenith replies that

> Item 7 is a factual report from Chelsea Boleyn. (Bueno Aff., ¶ 11.) Ms.
> Boleyn is a nurse, and one of only two eyewitnesses to the events that
> occurred between 6:01 p.m. and 6:09 p.m. on the day of Tyra Price's
> surgery. The day after Tyra's surgery, Ms. Boleyn prepared a written
> "late entry" factual report that has been produced by TIFS (see Pl. Appx.,
> p. 127). For unexplained reasons, Ms. Boleyn also prepared a second
> factual report three days later (i.e., four days after the surgery), and that
> second report (item 7) is now being withheld by TIFS.
>
> Ms. Bueno's carefully-worded affidavit says that Ms. Boleyn's
> second report "was received by, made for use by, and maintained by" the
> committee (Bueno Aff., ¶ 11), but it doesn't say that the second report was
> requested by the committee; or prepared with the committee's impetus;
> or even reviewed by the committee as part of its deliberative process.
> Indeed, absent from Ms. Bueno's affidavit is any suggestion that the
> committee had even begun or started its work when Boleyn's second
> report was prepared. By selectively producing only Ms. Boleyn's first
> report (which appears to be sanitized) (see, Pl. Appx., Doc. 37, p. 127), but
> hiding her second report, TIFS wants to have its cake and eat it too, by
> cherry-picking the facts that should be publicly disclosed. At best, Ms.
> Boleyn's second report appears to be a routine report that is typically
> prepared whenever one of TIFS's patients experiences a poor outcome.

Dkt. No. 55 at 4.

The Court determines that Ms. Bueno's affidavit does sufficiently place Ms.

Boleyn's report within the review process and therefore subject to the privileges. As

TIFS's counsel explained at oral argument, the "first report" that Zenith discusses was Ms. Boleyn's contemporaneous notes, and her only actual report was generated as part of the review process.

TIFS has met its burden as to Item 7, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

E.     Items 10-29

TIFS offers Ms. Bueno's affidavit [Dkt. No. 46 at 2-70 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 10-29 are protected by the state law medical peer review and medical committee privileges.

Zenith replies that

Items 10-29 are a series of "internal email correspondence regarding the logistics of" a meeting relating to TIFS's Root Cause Analysis (RCA). (Bueno Aff., ¶ 12.) These logistical emails aren't covered by the state law peer review privileges, because they have nothing to do with the committee's deliberative process. They are ordinary business records prepared outside of the investigative process, and do not reflect the committee's analysis or deliberations.

Dkt. No. 55 at 4-5.

As with Items 1 and 2, the Court cannot agree with Zenith's restrictive view of the scope of these Texas state law privileges under the governing case law and determines that TIFS has met its burden as to Items 10-29, as to which the Court

DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

F.     Items 30-31 and 50-52

TIFS offers Ms. Bueno's affidavit [Dkt. No. 46 at 2-70 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 30-31 and 50-52 are protected by the state law medical peer review and medical committee privileges.

Zenith replies that

Items 30-31 and 50-52 are communications relating to audit trails, and electronic copies of the audit trails themselves. (Bueno Aff., ¶ 18.) In the context of medical care, audit trails are typically show the sequence of events related to the use of and access to a patient's electronic health records. For instance, an audit trail will usually reveal who accessed a patient's records, when, and where the health care provider accessed the record. It can also show what the provider did with the records – e.g., simply reviewed them, prepared a note, or edited a note. The audit trail may also show how long the records were opened by a particular provider.

Here, Ms. Bueno's affidavit says that the audit trails were "used by" the committee, but it doesn't say (and presumably can't truthfully say) that the audit trails were prepared at the request of the committee. That's because audit trails are mandated by federal law (45 C.F.R. 164.312). Documents that must be generated as a matter of law are nothing more than ordinary business records and routinely accumulated information that does not fall within the scope of the peer review privilege. Passing those otherwise unprotected audit trails through the committee does not cloak the audit trails with privilege. (*See, e.g.*, *Hall v. Flannery*, 2015 U.S. Dist. LEXIS 57454, at *9 (S.D. Ill. May 1, 2015, No. 3:13-cv-914-SMY-DGW) [holding that peer review privilege did not extend to audit trails under Illinois state law].)

Production of the audit trails is particularly important in this case, because sworn deposition testimony shows that the post-surgery report prepared by Tyra Price's surgeon (Dr. MacMaster) was inexplicably and materially altered by an unknown person after the report was prepared. Indeed, with regard to his post-operative report, Dr. MacMaster testified that "it looks like it was revised"; "I don't recall revising it"; "I don't know

why I would revise it"; "I was not asked to revise the operative report"; "I couldn't have done it"; "I've never seen this [revised] document before"; "I never revised the thing"; and "I certainly don't recall revising it. I have no recollection of it. I have no recollection of seeing a revised form." (See, MacMaster Deposition, pp. 123-131, attached to this reply brief.) The withheld audit trails should assist in identifying the person who revised the post-operative report and when.

Dkt. No. 55 at 5-6.

At oral argument, TIFS's counsel conceded that the audit trails themselves would be discoverable but reported – without contradiction by Zenith's counsel – that Zenith has not served a document request that would cover them and as to which they could be produced without falling within these privileges. As attachments to emails or other communications that are communications within the committee's process, however, they are subject to the privileges. *See, e.g.*, *Brooks*, 927 S.W.2d at 18.

TIFS has met its burden as to Items 30-31 and 50-52, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

G.     Items 39-41 and 47-48

TIFS offers Ms. Bueno's affidavit [Dkt. No. 46 at 2-70 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 39-41 and 47-48 are protected by the state law medical peer review and medical committee privileges.

Zenith replies that

Items 39-41 and 47-48 are described only as emails that "sought input or assistance" from TIFS employees. (Bueno Aff., ¶ 16.) Without a further description or evidence from TIFS, there is no way for the Court or

> plaintiff to know whether these emails fall within the scope of the claimed privileges. Indeed, Ms. Bueno's affidavit says the emails are "confidential," but never explains why.

Dkt. No. 55 at 6.

Here, Ms. Bueno's affidavit supplements TIFS's privilege log, which provides a more specific description of each of these documents, which, as with Items 1 and 2, the Court determines to fall within the scope of these Texas state law privileges under the governing case law.

TIFS has met its burden as to Items 39-41 and 47-48, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

H.      Items 49 and 53

TIFS offers Ms. Bueno's affidavit [Dkt. No. 46 at 2-70 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 49 and 53 are protected by the state law medical peer review and medical committee privileges.

Zenith replies that

> Items 49 and 53 purport to be logs identifying the cases that will be reviewed by the committee. (Bueno Aff., ¶ 19.) Ms. Bueno's affidavit says that the logs can't be produced because they contain information about patients other than Tyra Price, however, that information can easily be redacted prior to production.

Dkt. No. 55 at 6.

These documents fall squarely within the scope of the peer review privilege as documents generated or prepared by or at the direction of the committee for committee purposes, regardless of whether they include other patients' protected information.

TIFS has met its burden as to Items 49 and 53, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

## II.    Attorney Work Product

### A.    Items 32-35 and 42

TIFS offers the Affidavit of John Croley, J.D. [Dkt. No. 46 at 139-142 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 32-35 and 42 are protected under work product doctrine.

Zenith replies that

Items 32-35 are emails between TIFS and its insurance broker that include "details of Ms. Price's claim." (Croley Decl., ¶ 4.) Those "details" were provided to the broker "to aid in the future litigation." (*Id.*) Likewise, item 42 is a copy of a form that TIFS filled out at the request of its liability insurance broker. (*Id.*, at ¶ 5.) These withheld items are not work product. The work product doctrine "does not extend to the underlying facts relevant to the litigation." (*Elec. Data Sys. Corp. v. Steingraber*, No. 4:02 CV 225, 2003 U.S. Dist .LEXIS 11818, at *12 (E.D. Tex. July 9, 2003).) "If a party or its attorney prepares a document in the ordinary course of business, 'it will not be protected [from discovery] even if the party is aware that the document may also be useful in the event of litigation.'" (*Occidental Chem. Corp. v. OHM Remediation Servs. Corp.*, 175 F.R.D. 431, 435 (W.D.N.Y. 1997) [citations omitted].) Since there appears to be no reasonable assertion that these materials are privileged or that they had any attorney involvement whatsoever, they should be produced.

Dkt. No. 55 at 8.

Under the governing law, a document need not be generated in the course of an ongoing lawsuit to qualify for work product protection, but the primary motivating purpose behind the document's creation must be to aid in possible future litigation; materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision; and among the factors relevant to determining the primary motivation for creating a document are whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance, where, if the document would have been created without regard to whether litigation was expected to ensue, it was made in the ordinary course of business and not in anticipation of litigation.

TIFS has met its burden, through Mr. Croley's affidavit testimony, to show that these documents were created primarily to aid in possible future litigation and not the ordinary course of business or pursuant to public requirements unrelated to litigation or for other nonlitigation purposes. Zenith's counsel asserted at oral argument that TIFS's primary motivation must have been to comply with its contractual obligations in connection with its liability insurance and not to aid in possible future litigation. Based on the nature of liability insurance, the Court cannot accept that argument.

Mr. Croley's affidavit sufficiently meets TIFS's burden as to Items 32-35, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests.

The Court further finds that, even assuming these documents are ordinary work product that do not reflect an attorney's thoughts, analysis or impressions, Zenith has not shown substantial need for these materials to prepare for its case and that it cannot obtain the substantial equivalent of the materials by other means without undue hardship. The Court is not persuaded by Zenith's counsel's explanation that it could seek the same information from depositions of any number of witnesses but, because Zenith's counsel cannot see these emails, Zenith might not ask the right questions to obtain some key information contained in these emails. That explanation would apply to almost any withheld work product in any case and does not suffice to meet Zenith's burden under Rule 26(b)(3).

B.     Items 54-56

TIFS also offers Mr. Croley's affidavit [Dkt. No. 46 at 139-142 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 54-56 are protected under work product doctrine.

Zenith does not specifically address these items in its reply. *See* Dkt. No. 55 at 7 ("Mr. Croley's affidavit is offered for the purpose of supporting TIFS's assertion that items 32-35, 42 and 54-63 are privileged work product."). But TIFS has met its burden, through Mr. Croley's affidavit testimony, to show that these documents were created primarily to aid in possible future litigation and not the ordinary course of business or pursuant to public requirements unrelated to litigation or for other nonlitigation purposes.

Mr. Croley's affidavit sufficiently meets TIFS's burden as to Items 54-56, as to which the Court DENIES Zenith's MTC and grants TIFS a protective order from production in response to Zenith's discovery requests. And, again, for the same reasons discussed above as to Items 32-35 and 42, Zenith has not shown substantial need for these materials to prepare for its case and that it cannot obtain the substantial equivalent of the materials by other means without undue hardship as Rule 26(b)(3) requires.

C.     Items 57-63

Finally, TIFS offers Mr. Croley's affidavit [Dkt. No. 46 at 139-142 of 164], in addition to TIFS's Second Amended and Supplemental Privilege Log [Dkt. No. 46 at 143-164 of 164], to support TIFS's assertion that Items 57-63 are protected under work product doctrine. TIFS contends that Mr. Croley's affidavit "establishes a prima facie case that the documents withheld are protected from discovery by the work product privilege," where Mr. Croley explains his role as Vice President of Finance/CFO and Compliance Officer of TIFS" and "that he anticipated litigation following Ms. Price's surgery because the surgery resulted in a significant unexpected outcome with potentially life-threatening complications" and then describes the correspondence at issue" and "explains that the correspondence was prepared in anticipation of litigation, or during ongoing litigation in preparation for trial." Dkt. No. 45 at 14. As to these documents specifically, TIFS explains that it withheld them from production as "internal communications between executives at TIFS regarding TIFS' litigation strategy, and internal communications regarding the ongoing lawsuit." *Id.* at 13.

Zenith replies that

Items 57-63 are internal email traffic between TIFS's non-attorney executives, apparently discussing such things as "analysis and recommendations regarding insurance coverage," "strategy regarding our defense," "responding to media inquiries" and "media coverage." (Croley Aff., ¶¶ 7-10.) Croley claims in his affidavit that these emails were all "made by TIFS in furtherance of its strategy and defense of Plaintiff's claim and in preparation for trial." (*Id.*) But it's important to note that many of the withheld emails appear to have been authored before TIFS's liability insurer appointed counsel to defend TIFS, before any legal advice was ever given to TIFS, and TIFS has made no showing that any of the withheld emails were ever actually sent to an attorney. Indeed, there is no evidence in the affidavit of any attorney involvement. So, it's difficult to imagine how the primary motivating purpose behind emails that discuss things like media coverage and media inquiries was to aid in litigation. Instead, the withheld emails appear to be nothing more than routine electronic conversations between corporate executives discussing the facts and circumstances of Tyra Price's medical care and ensuing consequences. No explanation has been offered by TIFS to show how the content of these withheld emails could possibly aid TIFS in any litigation, or that they are actually protected by the work product doctrine.

Dkt. No. 55 at 8-9 (emphasis omitted).

After reviewing Mr. Croley's affidavit and TIFS's privilege log, the Court determined that, as to these seven withheld documents, an in camera review of may assist the Court in making a final determination as to TIFS's work product claim and directed Defendants' counsel to deliver a copy of the documents to the undersigned for in camera review. *See* Dkt. No. 64 ("ELECTRONIC ORDER: To assist in the Court's resolving Plaintiff Zenith Insurance Company's Motion to Compel Production of Documents by Defendant Texas Institute for Surgery, L.L.P. [Dkt. No. 36], Defendant Texas Institute for Surgery, L.L.P.'s counsel is directed to – by 12:00 p.m. on September 13, 2018 – deliver to Shakira Todd in the U.S. District Clerk's Office, 1100

Commerce Street, 14th Floor, Dallas, Texas 75242, in a sealed envelope addressed to the undersigned's attention, one copy of the documents listed as Items 57-63 on the privilege log filed as Dkt. No. 46 at 161 of 164 for the Court's in camera review. (Ordered by Magistrate Judge David L. Horan on 9/11/2018.)").

Based on that in camera review, the Court determines that, as to Items 57, 58, 59, and 61, TIFS has met its burden, through Mr. Croley's affidavit testimony, to show that these documents were created primarily to aid in possible future or then-existing litigation and not the ordinary course of business or pursuant to public requirements unrelated to litigation or for other nonlitigation purposes and that they are properly protected from disclosure under the work product doctrine. And, for the same reasons discussed above as to Items 32-35 and 42, to the extent that all or any portion of these documents are ordinary work product that do not reflect an attorney's thoughts, analysis or impressions, Zenith has not shown substantial need for these materials to prepare for its case and that it cannot obtain the substantial equivalent of the materials by other means without undue hardship as required by Rule 26(b)(3).

But TIFS has not shown that Items 60, 62, and 63, while motivated by the existence of then-existing litigation, were created primarily to aid in then-existing litigation – as opposed to simply sharing between TIFS's personnel and/or director publicly available media coverage of the lawsuit filed against TIFS. *Accord Alabama Aircraft Indus., Inc. v. Boeing Co.*, No. 2:11-cv-3577-RDP, 2016 WL 9781826, at *5 (N.D. Ala. Mar. 24, 2016) (citing, among others, *Doe v. Soc'y of Missionaries of Sacred Heart*, No. 11-cv-2518, 2014 WL 1715376 at *4 (N.D. Ill. May 1, 2014)), *rep. & rec.*

*adopted*, 2016 WL 9782375 (N.D. Ala. May 3, 2016); *ADT Sec. Servs., Inc. v. Swenson*, Civil No. 07-2983 (JRT/AJB), 2010 WL 2954545 (D. Minn. July 26, 2010).

Accordingly, the Court determines that Items 60, 62, and 63 are not protected from disclosure under the work product doctrine and GRANTS Zenith's MTC as to Items 60, 62, and 63, which TIFS must produce to Zenith's counsel.

III    Award of Expenses

Under Rule 37(a)(5)(C), the Court determines that, considering all of the circumstances here, the parties will bear their own expenses, including attorneys' fees, in connection with Zenith's MTC where the Court finds substantial justification for the losing position on each of the disputes that the Court was required to decide because these matters all presented genuine disputes that were appropriately submitted for the Court's determination.

## Conclusion

For the reasons and to the extent explained below, the Court GRANTS in part and DENIES in part Plaintiff Zenith Insurance Company's Motion to Compel Production of Documents by Defendant Texas Institute for Surgery, L.L.P. [Dkt. No. 36].

This Memorandum Opinion and Order, and its rulings and requirements, are temporarily stayed until **October 3, 2018** to allow any party 14 days to file any objection to Judge Fitzwater under Federal Rule of Civil Procedure 72 and 28 U.S.C. § 636. If any objection is filed, this Memorandum Opinion and Order, and its rulings and requirements, will be automatically stayed pending further order of the Court.

SO ORDERED.

DATED: September 14, 2018

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE